**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | No. 1:16-cr-094 |
| v. | : | |
| | : | (Judge Kane) |
| **SAQUAN PARKER,** | : | |
| Defendant | : | |

**MEMORANDUM**

Before the Court is Defendant Saquan Parker's amended motion to suppress. (Doc. No. 25.) For the following reasons, the Court will grant Defendant's motion.

**I.    BACKGROUND**

On August 18, 2015, Detective Donald Cairns of the Susquehanna Township Police Department received a call from Chris Polkinghorn, the owner of a store named "We Buy Gold" and a longtime acquaintance of Detective Cairns. (Tr. at 4: 15-20; 5: 2-17.) The "We Buy Gold" store is located in Susquehanna Township, Pennsylvania and is in the business of buying and selling electronics, jewelry, and various goods "of that nature." (Tr. at 4: 15-20; 5: 2-4, 12-15.) Polkinghorn told Detective Cairns that earlier in the day, according to a female employee, two individuals visited his "We Buy Gold" store and wanted to sell firearms. (Tr. at 5: 23-24; 6: 1-4; 7: 9-14.) The employee had called Polkinghorn earlier that day and informed him that she "was very uncomfortable with the situation." (Tr. at 6: 2-7.) Polkinghorn was in Philadelphia at the time the two individuals visited the store.

The employee also reportedly asked the individuals to return later that day when Polkinghorn might be present. (Tr. at 6: 3-7.) Polkinghorn informed Detective Cairns that he had the cellphone number of one of the individuals, shared his intention to schedule a time for the individuals to return, and asked whether the police could be present when the individuals

1

returned to the "We Buy Gold" store.[1] (Tr. at 6: 8-13; 7: 1-8.) According to Detective Cairns' testimony, "[D]ue to the – just the uncomfortable feeling that the female [employee] had, [Polkinghorn] wanted the police to get involved. He wasn't sure exactly what was going on with the sale of these firearms, so he notified us."[2] (Tr. at 6: 10-13.) Based on Polkinghorn's suspicions, Detective Cairns arranged for additional officers to be in the area. (Tr. at 14: 21-25; 15: 1-17; 48: 1-8.)

Later that afternoon, Detective Cairns received another call from Polkinghorn, notifying him that two individuals had arrived at the "We Buy Gold" store in a sports utility vehicle ("SUV"). (Tr. at 8: 4-9.) Detective Cairns and Sergeant Aaron Osman drove in an unmarked car to the store, pulled into the alley behind the store, and watched Polkinghorn, Defendant Parker and Jordan Keys standing near a SUV with its hatch open. (Tr. at 8: 13-16; 9: 6-9; 16: 8-10; 18: 11-25; 19: 1-15; 48 at 22-23.) Detective Cairns and Sergeant Osman were dressed in plain clothes and began to approach the SUV.[3] (Tr. at 8: 9-10; 16.) By the time the officers and Defendant Parker made eye-contact, Keys had closed the SUV's hatch and started to run. (Tr. at 8: 18-20; 20: 1-17.) Sergeant Osman chased after Keys. (Tr. at 10: 9-15; 16: 8-13.)

Detective Cairns then rushed to Defendant Parker, immediately placed him in handcuffs, conducted a pat-down of the Defendant, and directed Defendant to sit handcuffed in the backseat

---

[1] The record is unclear whether Detective Cairns knew that Polkinghorn had previously had "dealings" with Defendant Parker. (Tr. at 14: 23-17; 26: 14-20; 28: 15-19.) The record is similarly unclear whether Polkinghorn "kn[ew] the name of the individuals to whom" he spoke on the morning of August 18, 2015. (Tr. at 14: 23-17.) Detective Cairns did not recall whether Polkinghorn told him "who he spoke to on the phone when he arranged that meeting later in the day." (Tr. at 7: 24-254; 8: 1-3.)

[2] Detective Cairns also testified that Polkinghorn requested the presence of law enforcement "just in case there was something awry about the situation." (Tr. at 7: 3-8.)

[3] The record is unclear whether Polkinghorn gave "[a] sort of signal" that he had "observed the guns" or whether Polkinghorn just said that the two individuals "were there" during the second call to Detective Cairns. (Tr. at 8: 4-9; 9: 8-15.)

of the police car with the door open.[4]  (Tr. at 10: 23-25; 11: 1-6; 16: 14-23; 17: 2-6.)  At the time Defendant was handcuffed, Detective Cairns had not asked him for his name or inquired into whether he had a firearm license.  (Tr. at 16: 22-25; 17: 1-6; 23: 22-25; 24: 1-6; 50 at 2-6.)  Detective Cairns testified that "[we] knew that there were more than likely guns involved in this situation, so for my safety, I put him in handcuffs and advised him, you know, as such. And he was fine, he was very cooperative with that."  (Tr. at 10: 25; 11: 1-3.)  At some point after handcuffing Defendant Parker, Detective Cairns looked into the back of the closed SUV and observed firearms inside the SUV.  (Tr. at 10: 25; 11: 1-3, 11-13; 25: 25; 26: 1.)

While sitting handcuffed in the backseat of the police car, Detective Cairns informed Defendant that he saw guns in the SUV.  (Tr. 11: 15-22.)  Defendant responded by discussing how Keys and Defendant intended to sell the guns, which Keys had obtained, to either Polkinghorn or members of a motorcycle gang.  (Tr. at 11: 4-7, 20-25; 12: 1-5; 25: 4-8; 28 at 1-2.)  Detective Cairns testified that Defendant continued to talk and even permitted him to search Defendant's person.  (Tr. at 12: 6-13.)  Detective Cairns discovered a small bag of cocaine in Defendant's pocket.  (Tr. at 12: 11-13; 34: 5-7.)  Detective Cairns then informed Defendant that he was under arrest for possession of drugs.  (Tr. at 12: 14-15.)  The record is not clear at what point Detective Cairns inquired into Defendant's record or determined that Defendant Parker was a felon.  (Tr. at 13: 5-15.)  The SUV was later towed, a search warrant was obtained, and several stolen rifles were discovered in the SUV.  (Tr. at 13: 15-20; 25: 25; 26: 1.)

On April 13, 2016, Defendant Parker was indicted by a grand jury on three counts: (Count 1) felon in possession of firearm, 18 U.S.C. §§ 922(g)(1), 924(e); (Count 2) possession of

---

[4] Contrary to Defendant Parker's assertions, the Court credits the testimony of Detective Cairns that he did not have his weapon drawn as he approached Defendant Parker.  (Tr. at 50: 8: 25; 9: 1-2; cf. Tr. at 16: 16-17.)

3

stolen firearm, 18 U.S.C. § 922(j); and (Count 3) conspiracy to commit offense against the United States, 18 U.S.C. § 922(j).  (Doc. No. 1.)  Defendant entered a plea of not guilty on October 4, 2016.  (Doc. No. 13.)  On November 4, 2016, Defendant filed a motion to suppress all evidence resulting from the allegedly unlawful detention and illegal arrest on August 18, 2015.  (Doc. No. 20.)  Defendant filed an amended motion to suppress on November 23, 2016 (Doc. No. 25), along with a supporting brief (Doc. No. 26).   The Government filed its brief in opposition on January 11, 2017 (Doc. No. 29).

On January 30, 2016, the Court conducted a suppression hearing.  (Doc. Nos. 34, 39.)  Detective Cairns, Sergeant Osman, and Defendant Parker testified to the events surrounding his arrest on August 18, 2015.  (Id.)  After the hearing, Defendant submitted a supplemental brief.  (Doc. Nos. 35.)  The Government filed a supplemental brief on February 23, 2017.  (Doc. No. 39.)  Defendant's motion to suppress is now ripe for disposition.

## II.     LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects the public against "unreasonable searches and seizures."  U.S. Const. Amend. IV.  "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause."  United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356-57 (1967)).  "Under the exception to the warrant requirement established in Terry, however, an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008) (internal quotations omitted).  "Any evidence obtained pursuant to an investigatory stop (also known as a 'Terry

stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" Id. (quoting United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006)).

## III. DISCUSSION

In his motion to suppress, Defendant moves the Court to suppress the evidence found in the SUV and his statements as the fruit of an unconstitutional seizure. (Doc. Nos. 25 ¶¶ 5, 7; 26 at 5.) Specifically, Defendant Parker argues that Detective Cairns lacked reasonable suspicion or probable cause to detain him.[5] (Doc. No. 26 at 5; see Doc. No. 35 at 5-7.) The Government maintains that the officers conducted a lawful investigatory stop of Defendant – based on reasonable, articulable suspicions – and that after Detective Cairns found cocaine on Defendant or discovered that Defendant was prohibited from possessing a firearm he had probable cause to arrest Defendant. (See Tr. at 53: 2-11; Doc. No. 29 at 5; 39 at 5-6.)

### A. Applicable Legal Standard

The Court must first determine the legal standard applicable to Detective Cairns' detention and handcuffing of Defendant Parker in the "We Buy Gold" parking lot. The parties do not dispute that Defendant was seized when Detective Cairns handcuffed and detained him. (See Doc. No. 29 at 5.) Defendant argues that his initial seizure amounted to an arrest and, in support thereof, cites the use of handcuffs, the number of police vehicles on scene, the number of officers present, and the application of force. (Doc. No. 33 at 3-5.) The Government characterizes the initial seizure as a brief, investigatory stop. (Doc. No. 29 at 5.) Accordingly, the Court must ascertain whether Defendant Parker's detention qualified as an investigatory stop or, alternatively, a de facto arrest. See United States v. Johnson, 592 F.3d 442, 447-48 (3d Cir. 2010).

---

[5] The parties did not address the propriety of Detective Cairns conducting a "protective frisk" of Defendant Parker for weapons. The Court declines to raise the issue sua sponte.

The use of handcuffs is "a hallmark of a formal arrest." United States v. Bailey, 743 F.3d 322, 340 (2d Cir. 2014) (internal citations and quotations omitted); see Johnson, 592 F.3d at 448. However, "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995). Similarly, "there is no per se rule that detention in a patrol car constitutes an arrest." Alexander v. Cty. of Los Angeles, 64 F.3d 1315, 1320 (9th Cir. 1995). "In determining whether a Terry stop has escalated into an arrest," the United States Court of Appeals for the Third Circuit has considered "the reasonableness of the intrusion ... balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." United States v. Goode, 309 F. App'x 651, 653 (3d Cir. 2009) (quoting Baker, 50 F.3d at 1192).

For example, in United States v. Goode, the United States Court of Appeals for the Third Circuit addressed whether a police confrontation was "an investigatory stop or an arrest at its onset." 309 F. App'x at 653. In that case, officers observed the defendant, a reputed drug dealer, engaged in the suspected sale of narcotics. Id. at 652. As the officers walked toward the defendant and announced themselves as police, a narcotics officer heard the defendant's associate say "Close the door, it's the police." Id. As the defendant's associate fled, a second officer drew his gun on the defendant, ordered defendant on the ground, and handcuffed him. Id. The Third Circuit in Goode concluded that the officer's conduct – drawing his gun, ordering [defendant] to the ground, and handcuffing him – did not exceed "the bounds of an investigatory stop." Id. at 653-54. The court in Goode reasoned that it was reasonable for the officer to restrain the defendant, "for the protection of the police and the protection of the community," because: (1) the defendant "was suspected of dealing drugs, a crime with which 'weapons and

violence are frequently associated;'" (2) the defendant "instigated the immediate confusion" of his associate's flight; and (3) the officer knew the defendant was also "suspected of being the gunman in an unrelated shooting incident." Id. at 654. The Third Circuit's fact-specific, reasonableness inquiry in Goode illustrates the difficulty in drawing a line "between a Terry stop, which requires only reasonable suspicion, and a de facto arrest, which must be supported by probable cause." Johnson, 592 F.3d at 447-48 (citing United States v. Sharpe, 470 U.S. 675, 685 (1985)).

Further guidance in distinguishing an investigatory stop from a de facto arrest is found in the decisions of the United States Courts of Appeals for the Second and Seventh Circuits, which focus on: (1) "[t]he nature of the crime under investigation;" (2) the "degree of suspicion;" (3) "the location of the stop;" (4) "the time of day;" and (5) "the reaction of the suspect to the approach of the police."[6] United States v. Ocampo, 890 F.2d 1363, 1369 (7th Cir. 1989); accord United States v. Harley, 682 F.2d 398, 402 (2d Cir. 1982); see also United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987) (following the factors delineated in the Second Circuit's Harley decision) (citing Harley, 682 F.2d at 402)). This Court examines each of the aforementioned factors in turn.

First, as to the nature of the suspected crime, Detective Cairns testified that he was "going to just basically talk to them and see what was going on", though "[he] knew that there were more than likely guns involved in this situation." (Tr. at 9: 14-15; 10: 25; 11: 1-3.)

---

[6] The United States Court of Appeals for the Ninth Circuit has similarly identified the following factors:
(1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (2) where the police have information that the suspect is currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have information that a crime that may involve violence is about to occur.
Green v. City & Cty. of San Francisco, 751 F.3d 1039, 1047 (9th Cir. 2014).

Second, the basis for suspecting wrongdoing was "the uncomfortable feeling" that Polkinghorn's employee experienced and Polkinghorn shared over the phone with Detective Cairns. As Detective Cairns testified, Polkinghorn's employee had "just [an] uncomfortable feeling" and Polkinghorn wanted to get the police involved because he "wasn't sure exactly what was going on with the sale of these firearms." (Tr. at 6: 8-13.) At the time he made the call, Polkinghorn had not observed the firearms, he did not know the name of the individuals, and he did not know whether the two individuals lawfully owned the firearms. (Tr. at 14: 12-17.) Similarly, at the time of Detective Cairns handcuffed Defendant Parker, the officers had not asked for Defendant's name, requested a firearm license, or even observed any firearms on Defendant or in the SUV. (Tr. at 10: 25; 11: 1-3, 11-13; 16: 22-25; 17: 1; 25: 25; 26: 1.)

Third, as to the location and time of the stop, the initial course of events took place in the back parking lot of a store during the daylight hours. (Tr. 9: 3-5; 48: 22-25.) Two uniformed officers in two marked cars were parked a block away. (Tr. 48: 22-25.) Defendant Parker stood next to an SUV that – at the time of Defendant's detainment – had been shut by Jordan Keys. Fourth, as to the suspect's reaction – when Detective Cairns rushed toward the Defendant – Defendant Parker immediately raised his hands in the air, did not run from the officers, and remained "very cooperative" with Detective Cairns. (Tr. at 10: 12-15; 21: 24-25; 22: 1-6.) Detective Cairns testified that he interpreted Defendant's decision to raise his hands as "showing that he was cooperative and he wasn't going to run and he just – just basically telling us, hey, look, I'm not going anywhere." (Tr. at 10: 18-20.)

Here, the Court recognizes that the time of the stop and Defendant's cooperative reaction strongly weigh in favor of this Court finding that Defendant's initial detainment amounted to a de facto arrest. However, given that Detective Cairns was left alone with Defendant Parker and

8

believed that "there were more than likely guns involved" (Tr. at 10: 25; 11: 1, 8-11), the Court finds that the use of handcuffs and placement of Defendant Parker in the open patrol car were reasonable steps to secure the scene and ensure officer safety.  See Johnson, 592 F.3d at 448 ("[P]lacing a suspect in handcuffs while securing a location or conducting an investigation [does not] automatically transform an otherwise-valid Terry stop into a full-blown arrest."). Accordingly, the Court declines to find that Defendant Parker's initial detention amounted to a de facto arrest.

      B.    **Reasonable Suspicion**

The Court must next determine whether Defendant Parker's investigatory stop was supported by reasonable suspicion.  Defendant argues that the officers lacked reasonable suspicion to detain Defendant Parker because they "had no reason to believe Parker had no license to sell firearms, was prohibited from possessing firearms, that the guns were stolen or that Parker knew the guns were stolen."  (Doc. No. 26 at 5.)  The Government concedes that the officers lacked probable cause when they approached Defendant (Tr. at 53: 2-4), but maintains that the police had a reasonable, articulable suspicion that Defendant and Jordan Keys were "involved in some sort of criminal activity" (Doc. No. 29 at 4).  Specifically, the Government cites Polkinghorn's suspicions and Jordan Keys' flight as the officers' basis for reasonable suspicion.  (Doc. No. 29 at 4; 39 at 5-6; Tr. at 52: 20-25; 53: 1-7.)

"[U]nder the exception to the warrant requirement established in Terry v. Ohio, 392 U.S. 1 (1968), 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (internal citations omitted).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing

9

considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (internal citations omitted). "Any evidence obtained pursuant to an investigatory stop … that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" Brown, 448 F.3d at 244.

Here, Detective Cairns received a call from Chris Polkinghorn, whom Detective Cairns had known for thirty years. (Tr. at 5: 2-7.) As Detective Cairns testified, Polkinghorn's employee had "[an] uncomfortable feeling" from her interaction with the two individuals attempting to sell firearms and Polkinghorn wanted to get the police involved because he "wasn't sure exactly what was going on with the sale of these firearms." (Tr. at 6: 8-13.) Later that afternoon, the officers received a second call from Polkinghorn that the two individuals had returned. (Tr. at 41: 8-20.) Polkinghorn described the two individuals and the SUV in which they had arrived. (Tr. at 8: 4-10.) The Government reasons that Polkinghorn's "concerns" that the sale of guns "might be illegal" and Keys' headlong flight "all understandably gave rise to a reasonable suspicion that criminal activity was afoot." (Doc. No. 39 at 6.) The Court first examines the interplay between headlong flight and reasonable suspicion.

In Illinois v. Wardlow, the United States Supreme Court held that unprovoked, headlong flight "upon noticing the police" in "an area of heavy narcotics trafficking" may amount to "reasonable suspicion" and justify a Terry stop. Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000). In that case, police officers converged on an area "known for heavy narcotics trafficking," observed the defendant holding an "opaque bag," and witnessed him subsequently flee from the police. Id. at 121-22. The officers later cornered the defendant, conducted a

"protective patdown search for weapons," and arrested him after finding a handgun during the Terry stop. Id. at 122-23. Emphasizing that "headlong flight" is "suggestive" of wrongdoing, the Supreme Court concluded that the officer "was justified in suspecting that [the defendant] was involved in criminal activity, and, therefore, in investigating further." Id. at 124-25.

Since Illinois v. Wardlow, the Third Circuit has stated that "the Supreme Court has never held that unprovoked flight alone is enough to justify a [Terry] stop." United States v. Bonner, 363 F.3d 213, 217 (3d Cir. 2004); accord United States v. Navedo, 694 F.3d 463, 472 (3d Cir. 2012) (citing Bonner, 363 F.3d at 217). "[S]uch flight and the setting in which it occurs, is merely one of many factors police may reasonably consider before making an investigative stop under Terry." Navedo, 694 F.3d at 472. The Third Circuit requires "some other indicia of wrongdoing," in addition to "flight upon noticing police," to justify a Terry stop. See Bonner, 363 F.3d at 217 (citing Wardlow, 528 U.S. at 125-26) ("The Supreme Court has held, however, that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion.").

The Court declines the Government's invitation to automatically impute the suspiciousness of Keys' headlong flight to Defendant Parker. "[R]easonable suspicion must be specifically directed to the person to be searched … the [F]ourth [A]mendment does not permit any automatic or casual transference of suspicion." United States v. Afanador, 567 F.2d 1325, 1331 (5th Cir. 1978) (internal quotation marks omitted); see also United States v. Lewis, 674 F.3d 1298, 1313 (11th Cir. 2012) ("[T]he piggybacking of reasonable suspicion, especially in a circumstance where the possible offense is of singular possession, is too attenuated to pass muster under the Fourth Amendment.").

However, even if the Court were to attribute Keys' unprovoked flight to suggest wrongdoing on the part of Defendant Parker, precedent requires that this Court identify "other indicia of wrongdoing" besides Keys' unprovoked flight from the officers to support a finding of reasonable suspicion. See Bonner, 363 F.3d at 217.  At the time Detective Cairns detained Defendant, the officers had not asked for Defendant's name, requested a firearm license, or even observed any firearms on Defendant or in the SUV. (Tr. at 10: 25; 11: 1-3, 11-13; 16: 22-25; 17: 1; 25: 25; 26: 1.)  When Detective Cairns rushed toward Defendant, Parker immediately raised his hands in the air, did not run from the officers, and remained "very cooperative" with Detective Cairns.  (Tr. at 10: 12-15; 21: 24-25; 22: 1-6.)  Detective Cairns did not testify to a history of crime in the vicinity or nervousness on the part of Defendant.  See Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003).

The Government cites the reliability of Polkinghorn as a source of information and his concerns that "the sale [of guns] might be illegal" as additional grounds for reasonable suspicion. (Doc. No. 39 at 6.)  Indeed, "officers may rely on a trustworthy second hand report, if that report includes facts that give rise to particularized suspicion."  Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003).  However, Detective Cairns testified that Polkinghorn's employee had "just [an] uncomfortable feeling" and that Polkinghorn wanted to get the police involved because he "wasn't sure exactly what was going on with the sale of these firearms."  (Tr. at 6: 8-13.) Polkinghorn was in Philadelphia when the two individuals first visited the store on August 18, 2015.  The concerns Polkinghorn communicated with Detective Cairns originated second-hand from the store employee.

Accordingly, the Court finds that the Government has not articulated more than an "inchoate and unparticularized suspicion or hunch' of criminal activity" at the time Detective

Cairns handcuffed Defendant Parker.  See Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (internal citations omitted).  The Government has not raised any basis for the fruit of the poisonous tree doctrine not to apply.  See United States v. Dupree, 617 F.3d 724, 729 (3d Cir. 2010); Brown, 448 F.3d at 244.  The Court will suppress all evidence resulting from Defendant's investigatory stop.

## IV.     CONCLUSION

For the reasons stated above, the Court will grant Defendant's amended motion to suppress evidence.  (Doc. No. 25.)  An order consistent with this memorandum follows.